UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TOMMIE ROBINSON,<br><br>Defendant | Criminal No. 25cr10338<br><br>Violations:<br><br>Count One: Health Care Fraud<br>(18 U.S.C. § 1347)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(7)) |

## INFORMATION

At all times relevant to this Information:

### General Allegations

1. Defendant TOMMIE ROBINSON ("ROBINSON"), a 43-year-old resident of Madison County, Alabama, was a doctor licensed to practice medicine in Alabama.

2. Expansion Media, LLC ("Expansion") was a Florida limited liability company that purported to provide telemedicine services.

3. Hybrid Management Group LLC ("Hybrid") was a Florida limited liability company that purported to provide telemedicine services.

4. Expansion and Hybrid were owned and operated by an individual named Steven Richardson.

5. Real Time Physicians ("RTP") was a Nevada limited liability company that purported to provide telemedicine services. RTP was owned and controlled by an individual named Marc Sporn.

6.      ROBINSON worked as an independent contractor for a Massachusetts based medical staffing company ("Staffing Company") for Expansion, Hybrid, and RTP.

*The Medicare Program*

7.      The Medicare Program ("Medicare") was a federally funded health insurance program affecting commerce that provided health care benefits to persons who were 65 years of age and older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

8.      Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

9.      The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services, oversaw and administered Medicare.

10.     Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

11.     Medicare covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers—including the ordering of durable medical equipment, prosthetics, orthotics, and supplies ("DME"), and diagnostic testing—that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

12.     Health care providers that provided services to Medicare beneficiaries, including DME suppliers and laboratories, were able to apply for and obtain a "provider number." A health

care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

13. To receive Medicare reimbursement, providers had to apply for and execute a written provider agreement, known as CMS Form 855I. The provider was required to sign and date the application, and the application contained certifications—under penalty of perjury— that the provider, among other things, agreed to abide by the Medicare laws and regulations, including the Anti-Kickback Statute, and that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

14. Medicare-enrolled providers were required to submit claims for services provided to Medicare beneficiaries. 42 U.S.C. § 1395w–4(g)(4).

15. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations.

16. Medicare paid for claims only if the items or services were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, accurately documented, and actually provided as represented to Medicare. Medicare would not pay for items or services that were procured through kickbacks and/or bribes.

*Durable Medical Equipment*

17. DME was reusable medical equipment such as orthotic devices, walkers, canes, and hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

18.     Medicare reimbursed DME providers for medically necessary items and services provided to beneficiaries. In claims submitted to Medicare for the reimbursement of DME, providers were required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and provider number of the provider who prescribed or ordered the equipment.

19.     Medicare paid claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of a diagnosed and covered illness or injury and was provided to a beneficiary. When seeking reimbursement from Medicare, providers submitted, among other things, the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System ("HCPCS").

20.     For certain types of orthotics, such as knee braces billed under HCPCS code L1833, Medicare Local Coverage Determinations ("LCDs") required that a provider conduct an in-person examination of a beneficiary and document that examination in the beneficiary's medical record. According to the LCDs, knee braces ordered without a documented in-person examination were not medically necessary and not appropriately reimbursable.

*Genetic Testing*

21.     Genetic testing for hereditary cancer used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Pharmacogenetic testing used DNA sequencing to assess how well a patient would likely respond to a specific drug therapy based on the patient's genes. Genetic tests that could predict future risks

of cardiac conditions and disease, such as Parkinson's and Alzheimer's, were also available. All such tests were generally referred to as "genetic testing." Genetic testing was not a method of diagnosing whether an individual had a disease, such as cancer, at the time.

22. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). In other words, Medicare generally did not cover tests used for screening purposes. Although there were statutory exceptions that permitted Medicare coverage of certain cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests," these statutory exemptions did not include genetic testing.

23. Because genetic testing did not fall within the statutory exceptions pertaining to certain screening tests, Medicare only covered such genetic testing in limited circumstances. For example, for cancer genetic testing, Medicare's coverage was generally limited to when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover cancer genetic testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

24. Even when Medicare allowed for reimbursement of diagnostic testing, Medicare imposed additional requirements before covering the testing. 42 C.F.R. § 410.32(a) provided that "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation

or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

*Telemedicine*

25. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

26. Legitimate telemedicine companies provided telemedicine or telehealth services to individuals by hiring doctors and other health care providers. Legitimate telemedicine companies typically paid doctors a fee to conduct consultations with patients. To generate revenue, legitimate telemedicine companies typically either billed insurance for the consultation, like an office visit, or received payment from patients who utilized the services of the telemedicine company. By contrast, in telemedicine fraud schemes, the telemedicine companies paid a health care provider based on the number of orders a medical provider reviewed, and typically the telemedicine company neither billed insurance for office visits nor collected fees from beneficiaries because no legitimate consultation occurred.

27. Medicare covered expenses for specified telehealth services if certain requirements were met. During much of the relevant period, these requirements included that (a) the beneficiary was located in a rural or heath professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner. *See* 42 C.F.R. § 410.78(b). During the COVID-19

pandemic, Medicare still required live video or audio communication (depending on the service being provided) between the practitioner and the beneficiary.

## Scheme to Defraud

28. From in or about December 2018 through in or about March 2021, ROBINSON engaged in a scheme to defraud Medicare by signing medical documentation, including doctors' orders for DME and genetic testing for Medicare beneficiaries that made it appear that ROBINSON was providing legitimate consultations to beneficiaries and exercising his medical judgment in approving doctors' orders consistent with medical standards. The doctors' orders were medically unnecessary, based on false documentation, tainted by kickbacks and bribes, and otherwise not covered by Medicare. The purpose of the scheme was to unlawfully enrich ROBINSON by submitting or causing the submission of false and fraudulent claims to Medicare.

29. In connection with the scheme, ROBINSON received requests for doctors' orders for DME and genetic testing on behalf of Expansion, Hybrid, and RTP. ROBINSON electronically signed the orders without seeing, speaking to, or otherwise communicating with the Medicare beneficiaries and without regard to whether the beneficiaries needed the genetic testing or DME.

30. ROBINSON also electronically signed the doctors' orders, medical records, and letters of medical necessity falsely certifying that he had consulted with, assessed, and/or evaluated beneficiaries prior to ordering DME and genetic testing.

31. Expansion and Hybrid paid the Staffing Company approximately $45 per beneficiary file, and the Staffing Company in turn paid ROBINSON approximately $20 per file, from a bank account in the District of Massachusetts held in the name of the Staffing Company.

32.     RTP paid the Staffing Company approximately $35 per beneficiary file, and the Staffing Company in turn paid ROBINSON approximately $15 per file, from a bank account in the District of Massachusetts held in the name of the Staffing Company, including a payment of approximately $405 on or around July 3, 2020.

33.     In total, ROBINSON caused DME suppliers and laboratories to submit approximately $6 million in false and fraudulent claims to Medicare, for which Medicare paid approximately $2.8 million.

Acts in Furtherance of the Scheme to Defraud

34.     From in or about December 2018 continuing through in or about March 2021, ROBINSON committed and caused to be committed the following acts, among others, in furtherance of the scheme to defraud:

  a.    On or about December 12, 2018, ROBINSON signed a Placement Order sent by the Staffing Company so that ROBINSON could sign doctor's orders for Expansion.

  b.    On or about April 22, 2019, ROBINSON signed a Placement Order sent by the Staffing Company so that ROBINSON could sign doctor's orders for RTP.

  c.    On or about June 7, 2019, ROBINSON signed doctors' orders from Expansion for Medicare Beneficiary 1, including for bilateral knee braces, two knee sleeves, and a back brace, for which Medicare was billed approximately $4,040 and paid approximately $2,618.87.

  d.    On or about June 12, 2020, ROBINSON signed doctors' orders from RTP for Medicare Beneficiary 2, including for bilateral knee braces, two knee sleeves, bilateral ankle

braces, and a back brace, for which Medicare was billed approximately $4,178.44 and paid approximately $2,973.22.

    e.  On or about July 3, 2020, ROBINSON received approximately $405 from Staffing Company for doctor's orders he completed for RTP.

COUNT ONE
Health Care Fraud
(18 U.S.C. § 1347)

The United States Attorney charges:

35.    The United States re-alleges and incorporates by reference paragraphs 1-34 of this Information.

36.    From in or around December 2018 and continuing through in or around March 2021, in the District of Massachusetts and elsewhere, the defendant,

TOMMIE ROBINSON,

did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, a health care benefit program affecting commerce as defined in 18 U.S.C. § 24(b), by means of materially false and fraudulent pretenses, representations and promises, in connection with the delivery of, and payment for, health care benefits, items, or services, by submitting or willfully causing the submission of, false and fraudulent claims to Medicare for DME and genetic testing, that were, among other things, not legitimately prescribed, not needed, not used, or induced through unlawful kickbacks on or about the date set forth below:

| Count | Medicare Beneficiary | Approx. Date of Claim | Claim No. | Approx. Total Amount Billed | Description of Devices Billed; HCPCS Code |
|---|---|---|---|---|---|
| 1 | Medicare Beneficiary 1 | 6/12/2020 | 20182731880000 | $1,978.44 | Right knee orthosis (L1833); Left knee orthosis (L1833); Addition to lower extremity orthosis, suspension sleeves (L2397) |

All in violation of Title 18, United States Code, Section 1347.

## FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

37. Upon conviction of one or more offenses in violation of Title 18, United States Code, Section 1347, set forth in Count One, the defendant,

TOMMIE ROBINSON,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The property to be forfeited includes, but is not limited to, the following asset:

   a. $36,895 in United States currency, to be entered in the form of a forfeiture money judgment.

38. If any of the property described in Paragraph 37, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant—

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the Court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 37 above.

All pursuant to Title 18, United States Code, Section 982(a)(7).

                          LEAH B. FOLEY
                          United States Attorney

By:   */s/ Howard Locker*
      ALEXANDRA BRAZIER
      HOWARD LOCKER
      LINDSEY ROSS
      Assistant U.S. Attorneys

Date: August 14, 2025